## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JERETH CAMACHO, derivatively on behalf of
LOCKHEED MARTIN CORPORATION,

c/o Timothy Brown Esq.
The Brown Law Firm, P.C.
767 Third Avenue, Suite 2501
New York, NY 10017

     *Plaintiff*,

     v.

LOCKHEED MARTIN CORPORATION,
6801 Rockledge Drive,
Bethesda, MD 20817

     Serve on:
     CSC-LAWYERS INCORPORATING
     SERVICE COMPANY
     7 St. Paul Street, Suite 820
     Baltimore, MD 21202

     *Nominal Defendant*,

and

JAMES D. TAICLET
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

EVAN T. SCOTT
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

JESUS MALAVE
c/o Lockheed Martin Corporation
6801 Rockledge Drive,

**C.A. No.** 1:25-cv-03013


**DEMAND FOR JURY TRIAL**

Bethesda, MD 20817

and

DAVID B. BURRITT
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

JOHN M. DONOVAN
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

JOSEPH F. DUNFORD, JR.
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

THOMAS J. FALK
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

VICKI A. HOLLUB
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

DEBRA L. REED-KLAGES
c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

and

PATRICIA E. YARRINGTON

c/o Lockheed Martin Corporation
6801 Rockledge Drive,
Bethesda, MD 20817

    *Defendants*.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Jereth Camacho ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lockheed Martin Corporation ("Lockheed" or the "Company"), files this Verified Shareholder Derivative Complaint against James D. Taiclet ("Taiclet"), Evan T. Scott ("Scott"), Jesus Malave ("Malave"), David B. Burritt ("Burritt"), John M. Donovan ("Donovan"), Joseph F. Dunford, Jr. ("Dunford"), Thoams J. Falk ("Falk"), Vicki A. Hollub ("Hollub"), Debra L. Reed-Klages ("Reed-Klages"), and Patricia E. Yarrington ("Yarrington") (collectively, the "Individual Defendants," and together with Lockheed, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Lockheed, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b),  20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Taiclet, Scott, and Malave for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases

published by and regarding Lockheed, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 23, 2024 to July 22, 2025, both dates inclusive (the "Relevant Period").

2.      The Company is a Maryland Corporation that describes itself as a "global aerospace and defense company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services." As such, the Company provides a "broad range of management, engineering, technical, scientific, logistics, systems integration and cybersecurity services."

3.       Lockheed primarily focuses on defense, space, intelligence, homeland security, and information technology, mainly cybersecurity. Its principal customers are U.S. government agencies. To this end, the company operates in four business segments: Aeronautics, Missiles and Fire Control, Rotary and Mission Systems, and Space. At present, the Company's largest program is its F-35 project, focused on development and sustainment of the F-35 Lightning II stealth fighter, which generated 26% of the Company's total consolidated net sales in 2024.

4.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused

the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

5.    On October 22, 2024, prior to the opening of markets, the Company announced that it was to recognize $80 million in losses on a classified program at the Company's Aeronautics business segment. The Company stated that such was the result of "higher than anticipated costs to achieve program objectives." Lockheed also announced at that time that it had recognized a reach-forward loss in its Rotary and Mission Systems segments "as a result of additional quantity ordering risk identified on fixed-price options."

6.    Similarly, on January 28, 2025, again before the market opened, Lockheed announced it was recording a pre-tax loss of $1.7 billion in connection with its classified programs at its Aeronautics and Missiles and Fire Control businesses. The Company stated that the loss was the "result of performance trends" and "in contemplation of near-term program milestones," it had "performed a comprehensive review of the program requirements, technical complexities, schedule, and risks" based on which it recognized $555 million of losses for the Aeronautics program. At the same time, Lockheed further announced additional losses of $1.3 billion in connection with its Missiles and Fire Control business because of, *inter alia*, "future requirements of the program," and "discussions with the customer and suppliers." Consequently, the Company's

net earnings in 2024 were $5.3 billion, or $22.31 per share of Company common stock, compared to the previous year's $6.9 billion, or $27.44 per share of Company common stock—a significant decline in financial performance.

7.      On July 22, 2025, the truth fully emerged when the Company *again* announced before the market opened that it was recording additional, massive losses. This time, Lockheed disclosed that it was recognizing an additional $1.6 billion in pre-tax losses from its classified programs. These losses included $950 million in losses related to its Aeronautics Classified program, which the Company stated resulted from "design, integration, and test challenges, as well as other performance issues." These losses also included $570 million in losses on its Canadian Maritime Helicopter Program, which the Company attributed to its provision of "additional mission capabilities, enhanced logistical support, fleet life extension, and revised expectations regarding flight hours." The Company also recorded a $95 million charge related to its Turkish Utility Helicopter Program, vaguely attributed to the "current status of the program." Consequently, the Company's reported net earnings were a comparatively meager $342 million, or $1.46 per share, including $1.6 ***billion*** of program losses and $196 million of other charges.

8.      On this news, the price per share of the Company's common stock fell $49.79, from a closing price on July 21, 2025 of $460.53 to close at $410.74 on July 22, 2025, a single-day decrease of 10.8%.

9.      The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, during the Relevant Period, they caused Lockheed to repurchase its own common stock at prices that were artificially inflated due to the foregoing misrepresentations and/or omissions, causing the Company to overpay for repurchases of its own

stock by approximately $746.5 million in total. In further breach of their fiduciary duties, two of the Individual Defendants simultaneously sold a combined 38,286 shares of Company common stock on inside information for approximate combined proceeds of $16.7 million.

10.    In light of the Individual Defendants' misconduct—which has subjected the Company; its Chief Executive Officer ("CEO"), President, and Board Chairman ("Chairman"); Chief Financial Officer ("CFO"); and its former CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

11.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO, President, Chairman, and present and former CFOs' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

<b><u>PARTIES</u></b>

**<u>Plaintiff</u>**

18.    Plaintiff is a current shareholder of Lockheed. Plaintiff has continuously held Lockheed common stock at all relevant times.

19.    Plaintiff is a citizen of Arizona.

**<u>Nominal Defendant Lockheed</u>**

20.     Lockheed is a Maryland corporation with its principal executive offices at 6801 Rockledge Drive, Bethesda, MD 20817. Lockheed's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LMT."

**Defendant Taiclet**

21.     Defendant Taiclet has served as a Company director since 2018, as the Company's CEO and President since 2020, and as Chairman since March 2021.

22.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Taiclet made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| February 23, 2025 | 15,675 | $440.72 | $6,908,286 |
| February 25, 2025 | 13,676 | $431.12 | $5,895,997 |

Thus, in total, before the fraud was exposed, Defendant Taiclet sold 29,351 shares of Company stock on inside information, for which he received approximately $12.8 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

23.     The Company's Schedule 14A filed with the SEC on March 27, 2025 (the "2025 Proxy Statement") stated the following about Defendant Taiclet, in relevant part:

**Notable Experience Provided to the Board**
- Effective leadership and executive experience as Chairman, President and CEO of Lockheed Martin Corporation and American Tower Corporation
- Expertise in management at large-scale, multinational corporations, including regulatory compliance, corporate governance, capital markets and financing, strategic planning and investor relations

- Industry-specific expertise from service as a U.S. Air Force officer and pilot and as an executive at Lockheed Martin, Honeywell Aerospace Services and Pratt & Whitney

**Selected Professional Experience**

- Chairman since March 2021 and President and CEO of Lockheed Martin since June 2020
- Chairman, President and CEO of American Tower Corporation from 2004 until March 2020 and Executive Chairman from March 2020 to May 2020
- President of Honeywell Aerospace Services, a unit of Honeywell International and Vice President, Engine Services of Pratt & Whitney, a unit of then-United Technologies Corporation

24.    Upon information and belief, Defendant Taiclet is a citizen of Maryland.

**Defendant Scott**

25.    Defendant Scott has served as the Company's CFO since April 17, 2025, and previously served as the Vice President and CFO of Lockheed Martin Space, as well as Vice President and Treasurer, Vice President and CFO of Lockheed Martin missiles and Fire Control.

26.    The Company's Corporate Governance page states the following about Defendant Scott:

> Evan Scott is the chief financial officer (CFO) for the Lockheed Martin Corporation. In this role, he is responsible for the corporation's financial strategies, processes, and operations.
>
> Scott began his career at Lockheed Martin in June 1999 and has held roles of increasing responsibility within the finance function including vice president and CFO of Lockheed Martin Space, vice president and treasurer, and vice president and CFO of Missiles and Fire Control.
>
> He has a bachelor's of science in finance and accounting from Syracuse University and a master's of business administration in finance from the University of Maryland. He is a graduate of Lockheed Martin's Finance Leadership Development Program and Finance Leadership Academy.

27.    Upon information and belief, Defendant Scott is a citizen of Maryland.

**Defendant Malave**

28.    Defendant Malave served as the Company's CFO from January 31, 2022 to April 16, 2025.

29.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Malave made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 23, 2025 | 8,935 | $440.72 | $3,937,833 |

Thus, in total, before the fraud was exposed, Defendant Malave sold 8,935 shares of Company stock on inside information, for which he received approximately $3.9 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30.     The Form 8-K which the Company filed with the SEC on January 2, 2022 (the "January 2022 8-K") stated the following about Defendant Malave, in relevant part:

> Mr. Malave served as Senior Vice President and Chief Financial Officer of L3Harris Technologies, Inc. ("L3Harris") from June 2019 through January 2022. Before joining L3Harris, Mr. Malave worked at United Technologies Corporation ("UTC"), as Vice President and Chief Financial Officer of UTC's Carrier Corporation from April 2018 to June 2019; as Chief Financial Officer of UTC's Aerospace Systems from January 2015 to April 2018; and as Head of Investor Relations from June 2012 to December 2014.

31.     Upon information and belief, Defendant Malave is a citizen of Washington.

**Defendant Falk**

32.     Defendant Falk has served as a Company director since 2010, and serves as the Independent Lead Director and as Chair of the Nominating and Corporate Governance Committee.

33.     The 2025 Proxy Statement stated the following about Defendant Falk, in relevant part:

**Notable Expertise Provided to the Board**

- Experience with the demands and challenges associated with managing global organizations from his experience as Chairman and CEO of Kimberly-Clark Corporation
- Knowledge of financial system management, public company accounting, disclosure requirements and financial markets
- Skilled in manufacturing, human capital management, compensation, corporate governance and public company boards

**Selected Professional Experience**

- Executive Chairman of Kimberly-Clark Corporation from January 2019 through December 2019
- Chairman and CEO of Kimberly-Clark from 2003 until December 2018 (CEO since 2002)
- President and COO of Kimberly-Clark from 1999 to 2002

34.    Upon information and belief, Defendant Falk is a citizen of Wisconsin.

**<u>Defendant Yarrington</u>**

35.    Defendant Yarrington has served as a Company director since 2020, and serves as

Chair of the Audit committee, and as a member of the Classified Business and Security Committee.

36.    The 2025 Proxy Statement stated the following about Defendant Yarrington, in

relevant part:

**Notable Expertise Provided to the Board**

- Expertise in public company accounting, risk management, disclosure and financial system management from her role as CFO at Chevron Corporation
- Over 38 years of experience with the demands and challenges of the global marketplace from her positions at Chevron
- Experience leading the financial operations aspects of digital and business transformation while CFO of Chevron

**Selected Professional Experience**

- Vice President and Chief Financial Officer of Chevron Corporation from 2009 to 2019
- Previously at Chevron, Vice President and Treasurer, 2007 to 2008; Vice President of Policy, Government and Public Affairs, 2002 to 2007 and Vice President of Strategic Planning, 2000 to 2002

- Served as director of Chevron Phillips Chemical Company LLC (a 50-50 joint venture with Phillips 66) and the Federal Reserve Bank of San Francisco, serving as the Chairman of the Bank's board from 2013 to 2014

37.    Upon information and belief, Defendant Yarrington is a citizen of Maryland.

**Defendant Dunford**

38.    Defendant Dunford has served as a Company director since 2020, and serves as Chair of the Classified Business and Security Committee, and as a member of the Nominating and Corporate Governance Committee.

39.    The 2025 Proxy Statement stated the following about Defendant Dunford, in relevant part:

**Notable Expertise Provided to the Board**

- Industry-specific expertise and knowledge of our core customer from his service in senior leadership positions with the U.S. military
- Experience with the demands and challenges associated with managing large organizations from his service as a Commander and Chairman of the Joint Chiefs of Staff
- Skilled in executive management, logistics, military procurement and cybersecurity threats

**Selected Professional Experience**

- Senior managing director and partner of Liberty Strategic Capital and member of the firm's investment committee since 2022
- Four Star U.S. Marine Corps General retiring in 2019 after more than 40 years of service, including as the 19th Chairman of the Joint Chiefs of Staff from 2015 to 2019; 36th Commandant of the Marine Corps and the Commander of all U.S. and NATO Forces in Afghanistan
- Chairman of the Board, Adams Presidential Center (non-profit)

40.    Upon information and belief, Defendant Dunford is a citizen of Maryland.

**Defendant Donovan**

41.     Defendant Donovan has served as a Company director since October 2021, and serves as Chair of the Management Development and Compensation Committee,  and as a member of the Classified Business and Security Committee.

42.     The 2025 Proxy Statement stated the following about Defendant Donovan, in relevant part:

**Notable Expertise Provided to the Board**

- Expertise in technology and innovation, including the transition to 5G networks, artificial intelligence and machine learning
- Skilled in overseeing global information, software development, supply chain, network operations and big data organizations
- Experience in cybersecurity, including Lead Independent Director of a leading cybersecurity company and Cybersecurity & Infrastructure Security Agency (CISA) committee leadership

**Selected Professional Experience**

- CEO of AT&T Communications, LLC, a wholly owned subsidiary of AT&T Inc. responsible for AT&T's telecommunications and video services, from 2017 until his retirement in 2019
- Chief Strategy Officer and Group President of AT&T Technology and Operations from 2012 to 2017
- Chief Technology Officer of AT&T from 2008 to 2012
- Chair of the President's National Security Telecommunications Advisory Committee from 2019 to 2023

43.     Upon information and belief, Defendant Donovan is a citizen of Texas.

**<u>Defendant Burritt</u>**

44.     Defendant Burritt has served as a Company director since 2008, and serves as a member of the Audit Committee and the Management Development & Compensation Committee.

45.     The 2025 Proxy Statement stated the following about Defendant Burritt, in relevant part:

**Notable Expertise Provided to the Board**

- Expertise in public company accounting, risk management, disclosure, financial system management, manufacturing and commercial operations and business transformation from roles as CEO and CFO at United States Steel Corporation (U.S. Steel) and CFO and Controller at Caterpillar Inc.
- Over 40 years' experience with the demands and challenges of manufacturing operations and the global marketplace from his positions at U.S. Steel and Caterpillar Inc.

**Selected Professional Experience**

- President and CEO of U.S. Steel since 2017
- President and COO of U.S. Steel in 2017
- Executive Vice President and CFO of U.S. Steel from 2013 to 2017
- CFO of Caterpillar Inc. until his retirement in 2010, after more than 32 years with the company

46.    Upon information and belief, Defendant Burritt is a citizen of Pennsylvania.

**Defendant Hollub**

47.    Defendant Hollub has served as a Company director since July 2018, and serves as a member of the Audit Committee and the Management Development & Compensation Committee.

48.    The 2025 Proxy Statement stated the following about Defendant Hollub, in relevant part:

**Notable Expertise Provided to the Board**

- Broad insight and experience with the demands and challenges associated with managing global organizations from her experience as President and CEO of Occidental Petroleum Corporation and more than three decades in executive and operational roles, including leading the $55 billion merger with Anadarko Petroleum Corporation
- Expertise in core customer markets in the Middle East and Latin America
- Skilled in enterprise risk management, environmental stewardship, safety and sustainability, including leading carbon capture, utilization and storage and other decarbonization initiatives

**Selected Professional Experience**

- President and CEO of Occidental Petroleum Corporation (Occidental) since 2016

- President and COO of Occidental from 2015 to 2016
- Senior Executive Vice President, Occidental and President, Oxy Oil and Gas - Americas from 2014 to 2015
- Executive Vice President, Occidental and Executive Vice President, U.S. Operations and Oxy Oil and Gas from 2013 to 2014

49.    Upon information and belief, Defendant Hollub is a citizen of Texas.

**Defendant Reed-Klages**

50.    Defendant Reed-Klages has served as a Company director since November 2019, and serves as a member of the Management Development & Compensation Committee and the Nominating and Corporate Governance Committee.

51.    The 2025 Proxy Statement stated the following about Defendant Reed-Klages, in relevant part:

**Notable Expertise Provided to the Board**

- Experience with the demands and challenges associated with managing global organizations from her experience as Chairman, President and Chief Executive Officer of Sempra Energy
- Skilled in enterprise risk management, environmental stewardship, safety, sustainability, digital transformation and developing global partnerships
- Knowledge of financial system management, compensation, corporate governance and public company boards

**Selected Professional Experience**

- Executive Chairman of Sempra Energy from May 2018 to December 2019
- Chairman (2012-2018), President (2017-2018) and CEO (2011-2018) of Sempra Energy
- Executive Vice President of Sempra Energy and President and CEO of SDG&E and SoCalGas, Sempra Energy's regulated California utilities
- President, COO and CFO of SDG&E and SoCalGas

52.    Upon information and belief, Defendant Reed-Klages is a citizen of California.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

53.    By reason of their positions as officers, directors, and/or fiduciaries of Lockheed and because of their ability to control the business and corporate affairs of Lockheed, the Individual

16

Defendants owed Lockheed and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lockheed in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lockheed and its shareholders so as to benefit all shareholders equally.

54.    Each director and officer of the Company owes to Lockheed and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lockheed, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56.    To discharge their duties, the officers and directors of Lockheed were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lockheed, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company,

has been ratified by the remaining Individual Defendants who collectively comprised a majority of Lockheed's Board at all relevant times.

58.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

59.    To discharge their duties, the officers and directors of Lockheed were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lockheed were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Maryland and the United States, and pursuant to Lockheed's own Code of Ethics and Business Conduct (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

18

(c)      remain informed as to how Lockheed conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Lockheed and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lockheed's operations would comply with all applicable laws and Lockheed's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.      Each of the Individual Defendants further owed to Lockheed and the shareholders the duty of loyalty requiring that each favor Lockheed's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

19

61.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Lockheed and were at all times acting within the course and scope of such agency.

62.    Because of their advisory, executive, managerial, directorial, and controlling positions with Lockheed, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

63.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lockheed.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

64.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

66.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Lockheed was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lockheed and was at all times acting within the course and scope of such agency.

## LOCKHEED'S CODE OF ETHICS

69.    Lockheed's Code of Ethics states in its introduction that its core values include "[d]o[ing] what's right," [r]espect[ing] others," and "[p]erform[ing] with excellence." Consequently, the Code of Ethics mandates that Lockheed's employees uphold the code because it "establishes the principles by which [the Company] maintain[s] [its] commitment to ethical business practices, which often go beyond what the law requires," and because "[m]aintaining the trust of employees, our customers and stakeholders is essential to ensuring sustainable success." Thus, the Company's Code of Ethics makes clear that it applies to the Company's "employees . . .

Board of Directors, consultants, contract laborers and others representing or acting for [the Company]."

70.    Furthermore, the Code of Ethics mandates that employees and directors "[t]ake prompt action to report violations of the Code, policy or a contract provision."  Employees and directors are also mandated to "[p]articipate in training," including "all required Business Conduct Compliance Training and annual Ethics Awareness training" to "prepare [them] to recognize and effectively react to situations requiring ethical decision making."

71.    The Code of Ethics states, in a section titled "Demonstrate Accountability," that Lockheed employees and directors, *inter alia*, must "[k]eep [a]ccurate [b]usiness [r]ecords and [a]ccurately [c]ommunicate to the [p]ublic." To this end, the Code of Ethics, in this section and under the subheading "We Set the Standard," states:

- You will honestly and accurately prepare all business and financial records.
- Conduct business transparently while not compromising proprietary or confidential information.
- Never misrepresent facts or falsify records.
- Promptly and accurately enter all business transactions in our books and business records.
- You have an obligation to make accurate disclosures to the public and our stockholders.

72.    In the same section, under the subheading "Why it Matters," the Code of Ethics states:

- Customers, regulators and investors expect us to maintain the integrity of our records. Complex business processes demand that each of us be able to rely on the accuracy of the data we provide each other to serve our customers.
- Keeping accurate records is critical to accurately recording and reporting financial transactions and meeting our legal and regulatory obligations.
- Our investors rely on accurate public disclosures.

73.    In the same section, under the subheading "What to Watch Out For," the Code of Ethics states:

- Every business record you provide helps us provide accurate disclosures to all government and regulatory agencies.
- Be mindful of any proprietary or confidential information included in any type of public disclosure / external communication.
- Properly account for all costs, including labor, travel, material and any other expenses.
- If you prepare business or financial records or public communications on behalf of the Corporation, ensure that they contain comprehensive, fair, timely, accurate and understandable information.
- Inaccurate pricing information submitted in proposals, reporting of business travel expenses, or labor charging, violates policy and may also be illegal.

74.     Under the section titled "Do Not Engage in Insider Trading," the Code of Ethics states the following:

- You must comply with all applicable securities laws and avoid even the appearance of impropriety.
- You must not engage in insider trading, which means you must not:
  - trade in the securities of any company (including Lockheed Martin) when you possess material, nonpublic information (MNPI) about that company,
  - suggest (or "tip") that others engage in such trading, or
  - share MNPI with others (including other employees of Lockheed Martin) unless authorized to do so.
- You are responsible for making sure that you do not share MNPI with your family and that you do not share MNPI with other employees of Lockheed Martin or third parties without express authorization. You can be held liable for the actions of others with whom you share MNPI.

75.     In the same section, under the subheading "Why It Matters," the Code of Ethics states that "[i]nvestors' trust in us and the public's trust in financial markets depend on confidence that trades in securities are based on publicly available information." Under the subheading "What to Watch Out For," the Code of Conduct states that the "terms 'securities,' 'trading,' 'material,' and 'nonpublic' have extensive and complicated legal definitions," and urges that if an employee "learn[s] of important information related to Lockheed Martin or a third party before the general public knows, there's a possibility it could be considered material nonpublic information." In such

cases, the Code of Ethics states, "[c]ommunicating such information to others may violate the law, even if you personally do not trade any securities based on such information."

76.    In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Additionally, two of the Individual Defendants violated the Code of Ethics by engaging in lucrative insider trading while the Company's common stock price was artificially inflated as a result of the Individual Defendants breaching their fiduciary duties to the Company by causing the Company to issue false and misleading statements. Moreover, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## LOCKHEED'S AUDIT COMMITTEE CHARTER

77.    The Company also maintains a charter for the Audit Committee (the "Audit Committee Charter"). The Audit Committee charter states, in relevant part, the following with regard to the purpose of the Committee:

> The purpose of the Audit Committee shall be to assist the Board of Directors in fulfilling its oversight responsibilities relating to (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the qualifications, independence and performance of the Corporation's independent auditors, (iv) the performance of the Corporation's internal audit function, and (v) strategy matters not covered by the Board of Directors or as requested by the Board of Directors and risks and opportunities to the strategy. The Audit Committee shall, except when such powers are by statute or regulation reserved to the Board of Directors, possess and may exercise the powers of the Board of Directors relating to all accounting and auditing matters for the

Corporation. All action by the Audit Committee shall be reported to the Board of Directors at its meeting next succeeding such action.

78.     Under the section titled "Responsibilities," in the subsection titled "Independent Auditors," the Audit Committee Charter states the following:

. . . Be directly responsible for the appointment, compensation, retention, oversight and termination of the independent auditors, which auditors shall report directly to the Audit Committee;

. . . Ensure that the independent auditors submit on a periodic basis (but at least annually) to the Audit Committee a report delineating all relationships between the independent auditor and the Corporation, and have authority to take appropriate action (including terminating the audit firm) in response to the independent auditors' report to assess and satisfy itself of the independent auditors' independence;

. . . Ensure that the independent auditors submit on a periodic basis (but at least annually) to the Audit Committee a report or reports describing (i) the independent auditors' internal quality-control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the auditors or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding one or more independent audits carried out by the auditing firm, and any steps taken to deal with any such issues;

. . . Pre-approve the audit, audit-related, non-audit, tax and other services to be provided by the Corporation's independent auditors, and the related fees, pursuant to pre-approval policies and procedures established by the Audit Committee;

. . . Review with the independent auditors any audit problems or difficulties and management's response thereto, and be directly responsible for the resolution of disagreements between management and the independent auditors regarding the Corporation's financial reporting;

. . . Require that the independent auditors advise the Audit Committee of any matters identified during reviews of quarterly financial statements or audits of annual financial statements which are required to be communicated to the Audit Committee by the independent auditors under generally accepted auditing standards, and that the independent auditors provide such communication prior to the related quarterly or annual press release or, if not practicable, prior to making the related Securities and Exchange Commission ("SEC") filings on Form 10-Q or Form 10-K;

. . . Evaluate the independent auditors' qualifications, performance and independence, including evaluation of the lead partner of the independent auditor, and monitor the rotation of the lead partner; and

. . . Establish policies for the Corporation's hiring of current or former employees of the independent auditors.

79.    Under the section titled "Responsibilities," in the subsection titled "Internal Auditors," the Audit Committee Charter states the following:

. . . Establish the mandate for the Corporation's internal audit organization. Approve the charter of the internal audit organization and any changes to the charter. Review the qualifications and work of the Corporation's internal audit staff, significant audit findings and management's actions to address these findings, and enterprise risk management processes. Review and approve the scope of the internal audit staff's work plan for the year, its budget and its staffing. Provide input on the appointment and removal of the Chief Audit Executive.

80.    Under the section titled "Responsibilities," in the subsection titled "Financial Statements, Disclosures and Related Matters," the Audit Committee Charter states the following:

33.3.1  Review with the Corporation's management, independent auditors and internal auditors, as appropriate, the following:

3.3.1.1  any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles, and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted or corrective actions taken in light of material control deficiencies;

3.3.1.2  any analyses prepared by management and/or the independent auditors setting forth significant accounting and financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative methods under generally accepted accounting principles on the financial statements; and

3.3.1.3  the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation.

3.3.2  Discuss with the Corporation's management the type and presentation of information included in the Corporation's earnings press releases, as well as financial information and earnings outlook provided to the public, analysts and rating agencies.

3.3.3  Prior to filing with the SEC, review and discuss with management and the independent auditors:

3.3.3.1  the Corporation's annual audited financial statements to be filed on Form 10-K, and recommend to the Board whether the annual audited financial statements

should be included in the Corporation's Form 10-K, with the review to include: (i) the independent auditors' judgment about the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments, and the clarity of the disclosures in the financial statements and (ii) the disclosure included in "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

3.3.3.2  management's assessment of and report on the effectiveness of internal control over financial reporting as of the end of the most recent fiscal year, and the independent auditors' related report;

3.3.3.3  the Corporation's quarterly financial statements to be filed on Form 10-Q, with the review to include the disclosures included in "Management's Discussion and Analysis of Financial Condition and Results of Operations;" and

3.3.3.4  any significant deficiencies or material weaknesses identified by management, the internal audit function or the independent auditors in connection with required quarterly certifications, and any change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Corporation's internal control over financial reporting.

3.3.4  Obtain and review a report from the independent auditors, prior to filing of the Form 10-K or Form 10-Q with the SEC, related to the Corporation's critical accounting policies and practices used; all alternative treatments under generally accepted accounting principles that have been discussed with management, including the ramifications of the use of such alternatives and the independent auditors' preferred treatment; and other material written communication between the independent auditors and management, as appropriate.

3.3.5  Prepare an Audit Committee report as required by the SEC to be included in the Corporation's annual proxy statement.

81.    Under the section titled "Responsibilities," in the subsection titled "Financial Matters," the Audit Committee Charter states the following:

3.4.1  Review and approve the Corporation's policies regarding derivative transactions (including, but not limited to, swaps, put and call options or combinations thereof, caps, floors, collars, and forward or spot exchanges) and related matters, as appropriate.

3.4.2  Review the financial status, investment performance and funding of the Corporation's postretirement benefit plans.

82.     Under the section "Responsibilities," in the subsection "Other Risk Management Matters," the Audit Committee States the following:

> 3.5 *Other Risk Management Matters*. Review the Corporation's processes, policies and practices with respect to risk identification, risk assessment and risk management, including discussing with management the Corporation's major risk exposures and the steps that have been taken to monitor and control such exposures and how those risks impact strategy.

83.     Under the section titled "Responsibilities," in the subsection titled "Legal and Regulatory Compliance Matters," the Audit Committee Charter states the following:

> 3.6.1  Establish procedures for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters and (ii) the confidential, anonymous submission to the Corporation of concerns regarding questionable accounting or auditing matters; and review summaries of complaints regarding accounting, internal accounting controls or auditing matters received pursuant to such procedures; and
>
> 3.6.2  Review with the General Counsel the status of pending claims, litigation, compliance with regulatory requirements (including the Foreign Corrupt Practices Act) and other legal or regulatory compliance matters on a periodic basis, but no less frequently than once a year on a comprehensive basis.

84.     Under the section titled "Responsibilities," in the subsection titled "Strategy," the Audit Committee Charter states the following:

> 3.7.1  Review risks and opportunities to the Corporation's strategy as identified by the Corporation's Enterprise Risk Management processes;
>
> 3.7.2  Review strategy on matters not covered by the Board of Directors and supplement the Board of Directors' review of strategy topics as appropriate or as requested by the Board of Directors.

85.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

86.     Lockheed describes itself as a "global aerospace and defense company principally engaged in the research, design, development, manufacture, integration and sustainment of advanced technology systems, products, and services." The Company, to that end, provides a "broad range of management, engineering, technical, scientific, logistics, systems integration and cybersecurity services."

87.     The Company primarily focuses on defense, space, intelligence, homeland security, and information technology, mainly cybersecurity. Its principal customers are U.S. government agencies. As such, the company operates in four business segments: Aeronautics, Missiles and Fire Control, Rotary and Mission Systems, and Space. At present, the Company's largest program is its F-35 project, focused on development and sustainment of the F-35 Lightning II stealth fighter, which generated 26% of the Company's total consolidated net sales in 2024.

## FALSE AND MISLEADING STATEMENTS

### *January 23, 2024 Press Release*

88.     The Relevant Period begins on January 23, 2024. On that date, Lockheed issued a press release in which it reported its financial results for the fourth quarter as well as the full year 2023 (the "Full Year 2023 Press Release").

89.     The Full Year 2023 Press Release boasted about Lockheed's financial results, and particularly its alleged net sales and net earnings. The Full Year 2023 Press Release stated, in relevant part:

- **Net sales of $18.9 billion in the fourth quarter and $67.6 billion in 2023**

- **Net earnings of $1.9 billion, or $7.58 per share in the fourth quarter; $6.9 billion, or $27.55 per share in 2023**

- **Cash from operations of $2.4 billion and free cash flow of $1.7 billion in the fourth quarter; cash from operations of $7.9 billion and free cash flow of $6.2 billion in 2023**

- **$3.8 billion of cash returned to shareholders through dividends and share repurchases in the fourth quarter, and $9.1 billion in 2023**

- **Record backlog of $160.6 billion**

- **2024 financial outlook provided**

**BETHESDA, Md.**, Jan. 23, 2024 – Lockheed Martin Corporation [NYSE: LMT] today reported fourth quarter 2023 net sales of $18.9 billion, compared to $19.0 billion in the fourth quarter of 2022. Net earnings in the fourth quarter of 2023 and 2022 were $1.9 billion, or $7.58 and $7.40 per share, respectively. Cash from operations was $2.4 billion in the fourth quarter of 2023, compared to $1.9 billion in the fourth quarter of 2022. Free cash flow was $1.7 billion in the fourth quarter of 2023, compared to $1.2 billion in the fourth quarter of 2022.

Net sales in 2023 were $67.6 billion, compared to $66.0 billion in 2022. Net earnings in 2023 were $6.9 billion, or $27.55 per share, compared to $5.7 billion, or $21.66 per share, in 2022. Cash from operations in 2023 was $7.9 billion, compared to $7.8 billion in 2022. Free cash flow in 2023 was $6.2 billion, compared to $6.1 billion in 2022.

* * *

| (in millions, except per share data) | 2024 Outlook[1] |
|---|---|
| Net sales | $68,500 - $70,000 |
| Business segment operating profit[2] | $7,175- $7,375 |
| Total FAS/CAS pension adjustment[3] | ~$1,685 |
| Diluted earnings per share[4] | $25.65 - $26.35 |
| Cash from operations | $7,750 - $8,050 |
| Capital expenditures | ~$1,750 |
| Free cash flow[2] | $6,000 - $6,300 |

### *January 23, 2024 Form 10-K*

90.     Also on January 23, 2024, the Company filed on Form 10-K with the SEC its annual report for the year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants Taiclet, Malave, Burritt, Donovan, Dunford, Falk, Hollub, Reed-Klages, and Yarrington and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Taiclet and Malave attesting to the accuracy of the 2023 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.     The 2023 10-K ostensibly reported the details of the Company's business segment results, including the Company's sales and profits. In so doing, the 2023 10-K stated that the Company's "contracts generally allow for the recovery of costs in the pricing of our products and services." The 2023 10-K further represented to investors that the Company "*identif[ies] and monitor[s] risks to the achievement of the technical, schedule and cost aspects of the contract*

*and assess[es] the effects of those risks on our estimates of total costs to complete the contract.*"[1]

The Company asserted that in so doing, "*increase[s] or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.*"

92.    The 2023 10-K, furthermore, included the below breakdown of its net sales and operating profits and accompanying explanation:

| | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| **Net sales** | | | | | | |
| Aeronautics | $ | 27,474 | $ | 26,987 | $ | 26,748 |
| Missiles and Fire Control | | 11,253 | | 11,317 | | 11,693 |
| Rotary and Mission Systems | | 16,239 | | 16,148 | | 16,789 |
| Space | | 12,605 | | 11,532 | | 11,814 |
| Total net sales | $ | 67,571 | $ | 65,984 | $ | 67,044 |
| **Operating profit** | | | | | | |
| Aeronautics | $ | 2,825 | $ | 2,867 | $ | 2,800 |
| Missiles and Fire Control | | 1,541 | | 1,637 | | 1,650 |
| Rotary and Mission Systems | | 1,865 | | 1,906 | | 2,030 |
| Space | | 1,158 | | 1,057 | | 1,184 |
| Total business segment operating profit | | 7,389 | | 7,467 | | 7,664 |
| Unallocated items | | | | | | |
| FAS/CAS pension operating adjustment | | 1,660 | | 1,709 | | 1,960 |
| Intangible asset amortization expense | | (247) | | (248) | | (285) |
| Severance and other charges (a) | | (92) | | (100) | | (36) |
| Other, net | | (203) | | (480) | | (180) |
| Total unallocated, net | | 1,118 | | 881 | | 1,459 |
| Total consolidated operating profit | $ | 8,507 | $ | 8,348 | $ | 9,123 |

\* \* \*

Management evaluates performance on our contracts by focusing on net sales and operating profit and not by type or amount of operating expense. Consequently, our discussion of business segment performance focuses on net sales and operating profit, consistent with our approach for managing the business. This approach is consistent throughout the life cycle of our contracts, as management assesses the bidding of each contract by focusing on net sales and operating profit and *monitors performance on our contracts in a similar manner through their completion.*

*Our contracts generally allow for the recovery of costs in the pricing of our products and services. Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our*

---

[1] All emphasis is added unless otherwise stated.

*estimated total costs to provide the product or service. This approach for negotiating contracts with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin.* We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices.

Many of our contracts span several years and include highly complex technical requirements. *At the outset of a contract, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of total costs to complete the contract. The estimates consider the technical requirements (e.g., a newly developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations.* Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract. *Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase.* All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed price contracts, see "Note 1 – Organization and Significant Accounting Policies" included in our Notes to Consolidated Financial Statements.

*We have a number of programs that are designated as classified by the U.S. Government which cannot be specifically described. The operating results of these classified programs are included in our consolidated and business segment results and are subjected to the same oversight and internal controls as our other programs.*

\* \* \*

Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on a particular contract. Conversely, conditions on a particular contract may deteriorate, resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit adjustments. *Increases or decreases in profit booking rates are recognized*

*in the current period they are determined and reflect the inception-to-date effect of such changes.*

93.     The 2023 10-K further represented that the Company had conducted a review of its internal disclosure controls and procedures, and that that review had shown said controls and procedures to be effective. In relevant part, to that end, the 2023 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2023. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were effective as of December 31, 2023.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes.

Our management conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2023. This assessment was based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 framework). *Based on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2023.*

* * *

*Classified Contracts*

A portion of our business is classified by the U.S. Government and cannot be specifically described. The operating results of classified contracts are included in our consolidated financial statements. The business risks and capital requirements associated with classified contracts historically have not differed materially from those of our other U.S. Government contracts. However, under certain classified fixed price development and production contracts, we are unable to insure risk of loss to government property because of the classified nature of the contracts and the inability to disclose classified information necessary for underwriting and claims to commercial insurers. *Our internal controls addressing the financial reporting of classified contracts are consistent with our internal controls for our non-classified contracts.*

34

94.     Furthermore, the 2023 10-K purported to warn investors of risks that "***could***" or "***may***" harm the Company. These warnings included that "profitability and cash flow ***may*** vary based on the mix of [the Company's] contracts and programs, [its] performance, and [its] ability to control costs." In relevant part, the 2023 10-K stated:

> ***Our profitability and cash flow may vary based on the mix of our contracts and programs, our performance, and our ability to control costs.***
>
> Our profitability and cash flow may vary materially depending on the types of government contracts undertaken, the nature of products produced or services performed under those contracts, the costs incurred in performing the work, the achievement of other performance objectives and the stage of performance at which the right to receive fees is determined, particularly under award and incentive-fee contracts. Failure to perform to customer expectations and contract requirements may result in reduced fees or losses and may adversely affect our financial performance.
>
> Contract types primarily include fixed-price and cost-reimbursable contracts. Cost-reimbursable contracts provide for the payment of allowable costs incurred during performance of the contract plus a fee up to a ceiling based on the amount that has been funded. Cost, schedule or technical performance issues with respect to cost-reimbursable contracts could result in reduced fees, lower profit rates, or program cancellation. Fixed-price contracts are predominantly either firm fixed-price (FFP) contracts or fixed-price incentive (FPI) contracts. Under FFP contracts, we receive a fixed price irrespective of the actual costs we incur and therefore we carry the burden of any cost overruns. Under FPI contracts the U.S. Government is responsible for our costs up to a negotiated ceiling price and we generally share, based on a negotiated sharing formula, savings from cost underruns and expenses, up to the negotiated ceiling price, from cost overruns. We bear the risk for all cost overruns that exceed the negotiated ceiling price. Due to the fixed-price nature of the contracts, if our actual costs exceed our estimates, our margins and profits are reduced and we could incur a reach-forward loss. A reach-forward loss is when estimates of total costs to be incurred on a contract exceed total estimates of the transaction price. When this occurs, a provision for the entire loss is determined at the contract level and is recorded in the period in which the loss is evident.
>
> Under both fixed-price and cost-reimbursable contracts, if we are unable to control costs, our operating results could be adversely affected. Costs to complete a contract may increase for many reasons, including technical and manufacturing challenges, schedule delays, workforce-related issues, inaccurate initial contract cost estimates, the timeliness and availability of materials from suppliers, internal and subcontractor performance or product quality issues, inability to meet cost

reduction initiatives or achieve efficiencies from digital transformation, changing laws or regulations, inflation and natural disasters. Certain contracts may impose other risks, such as forfeiting fees, paying penalties, or providing replacement systems in the event of performance failure.

***March 15, 2024 Proxy Statement***

95.    On March 15, 2024, the Company filed on Schedule 14A with the SEC its proxy statement for its 2024 shareholder meeting (the "2024 Proxy Statement"). Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages solicited the 2024 Proxy Statement, which contained material misstatements and omissions.

96.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect, *inter alia*, Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages to the Board; (2) approve, on an advisory basis, the compensation of certain named executive officers; (3) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent auditor for 2024.

97.    Regarding the Board's oversight functions, the 2024 Proxy Statement stated the following, in relevant part:

The Board and its committees undertake an integrated approach to overseeing the Company's business through a risk- and opportunity-focused lens that balances near- and long-term priorities. Core Board responsibilities include assessing corporate risk tolerance and monitoring management's processes for identifying and mitigating risks to ensure the Company's risk exposure is consistent with its strategic objectives. All of our directors have risk management expertise. The Board relies on a sophisticated risk management model and takes a particular interest in the Company's business strategy, cybersecurity and AI, our people strategy, sustainability, human rights and political and public policy advocacy, each of which is described more fully below.

**Board of Directors**

While the Board is ultimately responsible for risk oversight, the committees possess primary responsibility for certain risk management oversight, as shown below. The full Board retains primary oversight over areas such as capital structure/allocation, cybersecurity, AI and strategy that are not primarily overseen by a committee. The Board receives regular reports from committees and management covering risks.

**Audit Committee**

Oversight of financial, legal and compliance risks; the enterprise risk management process, including risk identification, risk assessment and risk management; evaluation of management's risk mitigation performance; and pension liability risks

**Management Development and Compensation Committee**

Oversight of executive succession planning and incentive compensation risks

**Classified Business and Security Committee**
Oversight of classified programs and security of personnel, facilities and data-related risks including classified cybersecurity, security of suppliers and the global supply chain within the classified business

**Nominating and Corporate Governance Committee**

Oversight of risk related to corporate governance, ethical conduct, sustainability, environmental stewardship (including climate change), corporate culture, health and safety programs and community and public relations

98.    Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

99.    The 2024 Proxy Statement was also materially false and/or misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations

of the Code of Ethics. Furthermore, the 2024 Proxy Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

100.    As a result of Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages causing the 2024 Proxy Statement to be false and misleading. Company shareholders vote to, *inter alia*: (1) reelect Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of certain named executives; and (3) ratify the appoint of EY as the Company's independent auditor for 2024.

### *April 23, 2024 Press Release*

101.    On April 23, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "Q1 2024 Press Release"). The Q1 2024 Press Release boasted about Lockheed's financial results, including its alleged net sales and net earnings, as below, in relevant part:

**Net sales of $17.2 billion**

**•Net earnings of $1.5 billion, or $6.39 per share**

**•Cash from operations of $1.6 billion and free cash flow of $1.3 billion**

**•$1.8 billion of cash returned to shareholders through dividends and share repurchases**

**•Reaffirms 2024 financial outlook**

**BETHESDA, Md.**, April 23, 2024 – Lockheed Martin Corporation [NYSE: LMT] today reported first quarter 2024 net sales of $17.2 billion, compared to $15.1 billion in the first quarter of 2023. Net earnings in the first quarter of 2024 were $1.5 billion, or $6.39 per share, compared to $1.7 billion or $6.61 per share, in the first quarter of 2023. Cash from operations was $1.6 billion in both the first quarters of 2024 and 2023. Free cash flow was $1.3 billion in both the first quarters of 2024 and 2023. First quarter 2024 results included 13 weeks compared to 12 weeks for first quarter 2023.

### *April 23, 2024 Form 10-Q*

102.    Also on April 23, 2024, the Company filed on Form 10-Q with the SEC its financial results for the first quarter of 2024 (the "Q1 2024 10-Q"). The Q1 2024 10-Q attached SOX certifications signed by Defendants Taiclet and Malave attesting to the accuracy of the Q1 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

103.    The Q1 2024 10-Q affirmed the previously reported financial results. The Q1 2024 10-Q also contained, ostensibly, details of the Company's net sales and profits, stating that, at the commencement of a novel contract, the Company's policy is to "***identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract.***" The Q1 2024 10-Q further stated that any "***[i]ncreases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.***"

104.    The Q1 2024 10-Q continued, stating, in relevant part, that the Company's financial performance was as follows:

| | | Quarters Ended | |
|---|---|---|---|
| | | March 31, 2024 | March 26, 2023 |
| **Net sales** | | | |
| Aeronautics | | $ 6,845 | $ 6,269 |
| Missiles and Fire Control | | 2,993 | 2,388 |
| Rotary and Mission Systems | | 4,088 | 3,510 |
| Space | | 3,269 | 2,959 |
| Total net sales | | $ 17,195 | $ 15,126 |
| **Operating profit** | | | |
| Aeronautics | | $ 679 | $ 675 |
| Missiles and Fire Control | | 311 | 377 |
| Rotary and Mission Systems | | 430 | 350 |
| Space | | 325 | 280 |
| Total business segment operating profit | | 1,745 | 1,682 |
| Unallocated items | | | |
| FAS/CAS pension operating adjustment | | 406 | 415 |
| Intangible asset amortization expense | | (61) | (62) |
| Other, net | | (61) | 2 |
| Total unallocated items | | 284 | 355 |
| Total consolidated operating profit | | $ 2,029 | $ 2,037 |

* * *

Our contracts generally allow for the recovery of costs in the pricing of our products and services. Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our estimated total costs to provide the product or service. This approach for negotiating contracts with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin. We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices.

We have a number of programs that are designated as classified by the U.S. Government which cannot be specifically described. *The operating results of these classified programs are included in our consolidated and business segment results and are subjected to the same oversight and internal controls as our other programs.*

* * *

Many of our contracts span several years and include highly complex technical requirements. *At the outset of a contract accounted for under the percentage-of-completion cost-to-cost method, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract,*

*as well as our ability to earn variable consideration. The estimates consider the technical requirements (e.g., a newly-developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations.* Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. *Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease.* The profit booking rate may also be adjusted if the total estimated value of the contract changes or there is a contract modification. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed-price contracts, see "Note 10 - Other" included in our Notes to Consolidated Financial Statements.

\* \* \*

Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit booking rate adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on a particular contract. Conversely, conditions on a particular contract may deteriorate, resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit booking rate adjustments. *Increases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.*

\* \* \*

## ITEM 4. Controls and Procedures

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of March 31, 2024. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). *Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were operating and effective as of March 31, 2024.*

There were no changes in our internal control over financial reporting during the quarter ended March 31, 2024 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***July 23, 2024 Press Release***

105.    On July 23, 2024, Lockheed issued a press release in which it reported its financial results for the second quarter of 2024 (the "Q2 2024 Press Release"). The Q2 2024 Press Release stated that the Company's results, including its alleged net sales, net earnings, and the Company's updated 2024 financial outlook, was as follows, in relevant part:

- Net sales of $18.1 billion, an increase of 9% year over year
- Net earnings of $1.6 billion, or $6.85 per share, inclusive of net nonoperational charges of $79 million ($63 million, or $0.26 per share, after-tax)
- Cash from operations of $1.9 billion and free cash flow of $1.5 billion
- $1.6 billion of cash returned to shareholders through dividends and share repurchases
- 2024 outlook increased for sales, segment operating profit and earnings per share

**BETHESDA, Md.**, July 23, 2024 – Lockheed Martin Corporation [NYSE: LMT] today reported second quarter 2024 net sales of $18.1 billion, compared to $16.7 billion in the second quarter of 2023. Net earnings in the second quarter of 2024 were $1.6 billion, or $6.85 per share, compared to $1.7 billion, or $6.63 per share, in the second quarter of 2023. Cash from operations was $1.9 billion in the second quarter of 2024, compared to $1.1 billion in the second quarter of 2023. Free cash flow was $1.5 billion in the second quarter of 2024, compared to $771 million in the second quarter of 2023.

***July 23, 2024 Form 10-Q***

106.    Also on July 23, 2024, the Company filed with the SEC its quarterly financial results on Form 10-Q (the "Q2 2024 10-Q"). The Q2 2024 10-Q attached SOX certifications signed by Defendants Taiclet and Malave attesting to the accuracy of the Q2 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

107.    The Q2 2024 10-Q not only affirmed the Company's previously reported financial results, but also ostensibly reported the Company's quarterly net sales and profit. The Q2 2024 10-Q stated that at the outset of a contract, the Company worked to "identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract" and any "[i]ncreases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes." The Q2 2024 10-Q also alleged the effectiveness of the Company's disclosure controls and procedures. Specifically, in relevant part, the Q2 2024 10-Q stated:

| | Quarters Ended | | Six Months Ended | |
| | June 30, 2024 | June 25, 2023 | June 30, 2024 | June 25, 2023 |
|---|---|---|---|---|
| **Net sales** | | | | |
| Aeronautics | $ 7,277 | $ 6,875 | $ 14,122 | $ 13,144 |
| Missiles and Fire Control | 3,102 | 2,755 | 6,095 | 5,143 |
| Rotary and Mission Systems | 4,548 | 3,897 | 8,636 | 7,407 |
| Space | 3,195 | 3,166 | 6,464 | 6,125 |
| Total net sales | $ 18,122 | $ 16,693 | $ 35,317 | $ 31,819 |
| **Operating profit** | | | | |
| Aeronautics | $ 751 | $ 718 | $ 1,430 | $ 1,393 |
| Missiles and Fire Control | 450 | 371 | 761 | 748 |
| Rotary and Mission Systems | 495 | 454 | 925 | 804 |
| Space | 346 | 312 | 671 | 592 |
| Total business segment operating profit | 2,042 | 1,855 | 3,787 | 3,537 |
| Unallocated items | | | | |
| FAS/CAS pension operating adjustment | 406 | 416 | 812 | 831 |
| Impairment and severance charges [(a)] | (87) | — | (87) | — |
| Intangible asset amortization expense | (61) | (62) | (122) | (124) |
| Other, net | (152) | (74) | (213) | (72) |
| Total unallocated items | 106 | 280 | 390 | 635 |
| Total consolidated operating profit | $ 2,148 | $ 2,135 | $ 4,177 | $ 4,172 |

* * *

***Our contracts generally allow for the recovery of costs in the pricing of our products and services.*** Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our estimated total costs to provide the product or service. This approach for negotiating contract with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin. We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices.

We have a number of programs that are designated as classified by the U.S. Government which cannot be specifically described. ***The operating results of these classified programs are included in our consolidated and business segment results and are subjected to the same oversight and internal controls as our other programs.***

\* \* \*

Many of our contracts span several years and include highly complex technical requirements. ***At the outset of a contract accounted for under the percentage-of completion cost-to-cost method, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract, as well as our ability to earn variable consideration. The estimates consider the technical requirements (e.g., a newly-developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations.*** Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. ***Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease.*** The profit booking rate may also be adjusted if the total estimated value of the contract changes or there is a contract modification. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed-price contracts, see "Note 10 - Other" included in our Notes to Consolidated Financial Statements.

\* \* \*

44

Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit booking rate adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on particular contract. Conversely, conditions on a particular contract may deteriorate, resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit booking rate adjustments. ***Increases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.***

\* \* \*

### ITEM 4. Controls and Procedures

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2024. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). ***Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were operating and effective as of June 30, 2024.***

There were no changes in our internal control over financial reporting during the quarter ended June 30, 2024 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

108.    The statements discussed in ¶¶ 88-94, 101-107 were materially false and/or misleading when made because they failed to disclose adverse material facts about the Company, including, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5)  as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

***October 22, 2024 Press Release***

109.    The truth began to emerge on October 22, 2024, when Lockheed issued a press release prior to the opening of the market reporting its financial results for the third quarter of 2024 (the "Q3 2024 Press Release"). According to the Q3 2024 Press Release, Lockheed was forced to record losses of $80 million on a classified program in the Company's Aeronautics segment "***due to higher than anticipated costs to achieve program objectives.***" The Q3 2024 Press Release further announced Lockheed was recognizing a reach-forward loss in its Rotary and Mission Systems segment "as a result of additional quantity ordering risk identified on fixed-price options." Specifically, the Q3 2024 Press Release stated, in relevant part:

- Net sales of $17.1 billion, an increase of 1% year over year
- Net earnings of $1.6 billion, or $6.80 per share
- Cash from operations of $2.4 billion and free cash flow of $2.1 billion
- $1.6 billion of cash returned to shareholders through dividends and share repurchases
- Increased share repurchase authority by $3.0 billion to a total authorization of $10.3 billion
- Increased quarterly dividend 5% to $3.30 per share
- 2024 financial outlook increased

**BETHESDA, Md.**, Oct. 22, 2024 – Lockheed Martin Corporation [NYSE: LMT] today reported third quarter 2024 net sales of $17.1 billion, compared to $16.9 billion in the third quarter of 2023. Net earnings in the third quarter of 2024 were $1.6 billion, or $6.80 per share, compared to $1.7 billion, or $6.73 per share, in the third quarter of 2023. Cash from operations was $2.4 billion in the third quarter of 2024, compared to $2.9 billion in the third quarter of 2023. Free cash flow was $2.1 billion in the third quarter of 2024, compared to $2.5 billion in the third quarter of 2023.

\* \* \*

The company's consolidated net favorable profit booking rate adjustments represented approximately 20% and 19% of total segment operating profit in the quarters ended Sept. 29, 2024 and Sept. 24, 2023. ***During the quarter ended Sept. 29, 2024, the company recognized losses of $80 million on a classified program***

*at the company's Aeronautics business segment due to higher than anticipated costs to achieve program objectives.*

\* \* \*

RMS' operating profit in the third quarter of 2024 was comparable to the same period in 2023 as a $25 million increase due to the higher volume described above was offset by $25 million of lower profit booking rate adjustments. ***The decrease in profit booking rate adjustments was primarily due to a reach-forward loss recognized on a radar program as a result of additional quantity ordering risk identified on fixed-price options.***

110.    On this news, the price per share of the Company's common stock fell $37.63, from a closing price on October 21, 2024 of $614.61 to close at $576.98 on October 22, 2024, a single-day decrease of 6.1%. However, because the Individual Defendants continued to make and/or cause the Company to make materially false and/or misleading statements, the full truth continued to remain obscured.

### October 22, 2024 Form 10-Q

111.    On October 22, 2024, Lockheed filed on Form 10-Q with the SEC its quarterly report for the third quarter of 2024 (the "Q3 2024 10-Q"). The Q3 2024 10-Q attached SOX certifications signed by Defendants Taiclet and Malave attesting to the accuracy of the Q3 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

112.    The Q3 2024 10-Q began by affirming the Company's previously reported financial results before continuing on to report that the Company, at the outset of its contracts, works to "identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete

the contract" and any "*[i]ncreases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.*"

113.    The Q3 2024 10-Q also stated, in relevant part, the Company's financial results:

| | Quarters Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 29, 2024 | September 24, 2023 | September 29, 2024 | September 24, 2023 |
| **Net sales** | | | | |
| Aeronautics | $ 6,487 | $ 6,717 | $ 20,609 | $ 19,861 |
| Missiles and Fire Control | 3,175 | 2,939 | 9,270 | 8,082 |
| Rotary and Mission Systems | 4,367 | 4,121 | 13,003 | 11,528 |
| Space | 3,075 | 3,101 | 9,539 | 9,226 |
| Total net sales | $ 17,104 | $ 16,878 | $ 52,421 | $ 48,697 |
| **Operating profit** | | | | |
| Aeronautics | $ 659 | $ 671 | $ 2,089 | $ 2,064 |
| Missiles and Fire Control | 456 | 398 | 1,217 | 1,146 |
| Rotary and Mission Systems | 483 | 482 | 1,408 | 1,286 |
| Space | 272 | 259 | 943 | 851 |
| Total business segment operating profit | 1,870 | 1,810 | 5,657 | 5,347 |
| Unallocated items | | | | |
| FAS/CAS pension operating adjustment | 406 | 414 | 1,218 | 1,245 |
| Impairment and severance charges [a] | — | — | (87) | — |
| Intangible asset amortization expense | (61) | (61) | (183) | (185) |
| Other, net | (75) | (121) | (288) | (193) |
| Total unallocated items | 270 | 232 | 660 | 867 |
| Total consolidated operating profit | $ 2,140 | $ 2,042 | $ 6,317 | $ 6,214 |

\* \* \*

***Our contracts generally allow for the recovery of costs in the pricing of our products and services***. Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our estimated total costs to provide the product or service. This approach for negotiating contracts with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin. We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices. We have a number of programs that are designated as classified by the U.S. Government, which cannot be specifically described. ***The operating results of these classified programs are included in our consolidated and business segment results and are subjected to the same oversight and internal controls as our other programs.***

48

* * *

Many of our contracts span several years and include highly complex technical requirements. ***At the outset of a contract accounted for under the percentage-of completion cost-to-cost method, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract, as well as our ability to earn variable consideration. The estimates consider the technical requirements (e.g., a newly developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations. Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease. The profit booking rate may also be adjusted if the total estimated value of the contract changes or there is a contract modification. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed-price contracts, see "Note 10 - Other" included in our Notes to Consolidated Financial Statements.***

* * *

Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit booking rate adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on a particular contract. Conversely, conditions on a particular contract may deteriorate, resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit booking rate adjustments. ***Increases or decreases in profit booking rates are recognized in the current period they are determined and reflect the inception-to-date effect of such changes.***

* * *

**ITEM 4. Controls and Procedures**

49

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of September 29, 2024. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). ***Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were operating and effective as of September 29, 2024***.

There were no changes in our internal control over financial reporting during the quarter ended September 29, 2024 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

114.    The statements discussed in ¶¶ 110-113 were materially false and/or misleading when made because they failed to disclose adverse material facts about the Company, including, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5)  as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *January 28, 2025 Press Release*

115.    On January 28, 2025, prior to the market's opening, Lockheed issued a press release issuing its financial results for the final quarter of and full year 2024 (the "2024 Full Year Press Release"). The 2024 Full Year Press Release announced that the Company was recording pre-tax losses of $1.7 billion in connection with its Aeronautics and Missiles and Fire Control businesses.

116.    According to the 2024 Full Year Press Release, Lockheed was recognizing $555 million of losses for its Aeronautics program because it had "performed a comprehensive review of the program requirements, technical complexities, schedule, and risks." The Company,

consequently, reported in the 2024 Full Year Press Release net earnings of $5.3 billion, or $22.31 per share, including $2.0 billion ($1.5 billion, or $6.16 per share after tax) of losses for classified programs. This stood in stark contrast to the $6.9 billion, or $27.55 per share, that the Company had reported in 2023. The 2024 Full Year Press Release stated, in relevant part:

- 2024 net sales increased 5% to $71.0 billion
- Recorded pre-tax losses of $1.7 billion and $2.0 billion associated with classified programs in the fourth quarter and full year, which impacted earnings per share by $5.45 and $6.16
- Earnings per share of $2.22 in the fourth quarter and $22.31 in 2024, including impact of classified programs losses
- Cash from operations of $7.0 billion and free cash flow of $5.3 billion in 2024 after a pension contribution of $990 million
- Returned $6.8 billion of cash to shareholders through dividends and share repurchases in 2024
- Record backlog of $176.0 billion at end of 2024
- 2025 financial outlook provided

**BETHESDA, Md.**, Jan. 28, 2025 – Lockheed Martin Corporation [NYSE: LMT] today reported fourth quarter 2024 net sales of $18.6 billion, compared to $18.9 billion in the fourth quarter of 2023. Net earnings in the fourth quarter of 2024 were $527 million, or $2.22 per share, including $1.7 billion ($1.3 billion, or $5.45 per share, after-tax) of losses for classified programs, compared to $1.9 billion, or $7.58 per share, in the fourth quarter of 2023. Cash from operations was $1.0 billion in the fourth quarter of 2024, after a pension contribution of $990 million, compared to $2.4 billion in the fourth quarter of 2023. Free cash flow was $441 million in the fourth quarter of 2024, after a pension contribution of $990 million, compared to $1.7 billion in the fourth quarter of 2023. Fourth quarter 2024 results included 13 weeks, compared to 14 weeks for fourth quarter 2023, which had an unfavorable impact on sales volume across the company.

Net sales in 2024 were $71.0 billion, compared to $67.6 billion in 2023. Net earnings in 2024 were $5.3 billion, or $22.31 per share, including $2.0 billion ($1.5 billion, or $6.16 per share, after-tax) of losses for classified programs, compared to $6.9 billion, or $27.55 per share, in 2023. Cash from operations was $7.0 billion in 2024, after a pension contribution of $990 million, compared to $7.9 billion in 2023. Free cash flow was $5.3 billion in 2024, after a pension contribution of $990 million, compared to $6.2 billion in 2023.

\* \* \*

**Earnings Impacts of Classified Program Losses and Other Items**

During the fourth quarter of 2024, the company recognized losses associated with existing classified programs at its Aeronautics and Missiles and Fire Control (MFC) business segments.

The company's Aeronautics business segment has an existing classified fixed-price incentive fee contract that involves highly complex design and systems integration. The program includes a base contract for the initial phase of the program and multiple options for additional phases. The company previously disclosed it continues to monitor the technical requirements and its performance, the remaining work and any future changes in scope or schedule, and estimated costs to complete the program, and it may have to record additional losses in future periods if further performance issues, increases in scope, or cost growth occur. As a result of performance trends experienced in the fourth quarter 2024 and in contemplation of near-term program milestones, the company performed a comprehensive review of the program requirements, technical complexities, schedule, and risks. Based on that review, the company has identified higher projected costs in engineering and integration activities that are necessary to achieve those forthcoming milestones and recognized losses across the program phases of $410 million in the fourth quarter of 2024. As of December 31, 2024, losses for the year were approximately $555 million, including the fourth quarter loss.

The company's MFC business segment has an existing classified contract, which includes a cost-reimbursable base contract for the initial phase of the program and multiple fixed-price options for additional phases. The company previously disclosed the options may be exercised over the next several years and if performed expects they would each be at a loss. During the first quarter of 2024, the company concluded it was probable that the first option would be exercised and recognized a loss of approximately $100 million. During the fourth quarter of 2024, the company again assessed the likelihood that additional options may be exercised and now believe it is probable that all options will be exercised based on performance to date, future requirements of the program, discussions with the customer and suppliers, and anticipated customer funding, among other factors, resulting in the recognition of additional losses of approximately $1.3 billion, which is consistent with the amount the company previously disclosed. For the year ended Dec. 31, 2024, MFC recognized losses of $1.4 billion for this program, including the fourth quarter loss.

117.    On this news, the price per share of the Company's common stock fell $46.24, from a closing price on January 27, 2025 of $503.69 to close at $457.45 on January 28, 2025, a single-day decrease of 9.2%. However, because the Individual Defendants continued to make and/or cause the Company to make materially false and/or misleading statements, the full truth continued to remain obscured.

*January 28, 2025 Form 10-K*

118.   Also on January 28, 2025, Lockheed filed on Form 10-K with the SEC its annual report for the year 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Taiclet, Malave, Burritt, Donovan, Dunford, Falk, Hollub, Reed-Klages, and Yarrington and attached SOX certifications signed by Defendants Taiclet and Malave attesting to the accuracy of the 2024 10-K and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

119.   The 2024 10-K reported that the Company's "***contracts generally allow for the recovery of costs in the pricing of our products and services.***" The 2024 10-K also represented that Lockheed "***identif[ies] and monitor[s] risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of t hose risks on our estimates of sales and total costs to complete the contract***" and that corresponding "***[i]ncreases or decreases in profit booking rates are recognized in the period they are determined and reflect the inception-to-date effect of such changes.***" Specifically, the 2024 10-K stated, in relevant part:

|  | | 2024 | | 2023 | | 2022 |
|---|---|---|---|---|---|---|
| **Net sales** | | | | | | |
| Aeronautics | $ | 28,618 | $ | 27,474 | $ | 26,987 |
| Missiles and Fire Control | | 12,682 | | 11,253 | | 11,317 |
| Rotary and Mission Systems | | 17,264 | | 16,239 | | 16,148 |
| Space | | 12,479 | | 12,605 | | 11,532 |
| Total net sales | $ | 71,043 | $ | 67,571 | $ | 65,984 |
| **Cost of sales** | | | | | | |
| Aeronautics | $ | 26,093 | $ | 24,649 | $ | 24,110 |
| Missiles and Fire Control | | 12,277 | | 9,712 | | 9,676 |
| Rotary and Mission Systems | | 15,391 | | 14,399 | | 14,258 |
| Space | | 11,308 | | 11,473 | | 10,565 |
| Total cost of sales | $ | 65,069 | $ | 60,233 | $ | 58,609 |
| **Operating profit** | | | | | | |
| Aeronautics | $ | 2,523 | $ | 2,825 | $ | 2,867 |
| Missiles and Fire Control | | 413 | | 1,541 | | 1,637 |
| Rotary and Mission Systems | | 1,921 | | 1,865 | | 1,906 |
| Space | | 1,226 | | 1,158 | | 1,057 |
| Total business segment operating profit | | 6,083 | | 7,389 | | 7,467 |
| Unallocated items | | | | | | |
| FAS/CAS pension operating adjustment | | 1,624 | | 1,660 | | 1,709 |
| Intangible asset amortization expense | | (247) | | (247) | | (248) |
| Impairment and severance charges [a] | | (87) | | (92) | | (100) |
| Other, net | | (360) | | (203) | | (480) |
| Total unallocated, net | | 930 | | 1,118 | | 881 |
| Total consolidated operating profit | $ | 7,013 | $ | 8,507 | $ | 8,348 |

\* \* \*

***Our contracts generally allow for the recovery of costs in the pricing of our products and services.*** Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our estimated total costs to provide the product or service. This approach for negotiating contracts with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin. We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices.

We have a number of programs that are designated as classified by the U.S. Government, and that cannot be specifically described. ***The operating results of these classified programs are included in our consolidated and business segment results and are subject to the same oversight and internal controls as our other programs.***

\* \* \*

Many of our contracts span several years and include highly complex technical requirements. **At the outset of a contract accounted for under the percentage-of completion cost-to-cost method, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract, as well as our ability to earn variable consideration. The estimates consider the technical requirements (e.g., a newly developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations.** Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. **Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease.** The profit booking rate may also be adjusted if the total estimated value of the contract changes or there is a contract modification. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed-price contracts, see "Note 1 – Organization and Significant Accounting Policies" included in our Notes to Consolidated Financial Statements.

\* \* \*

Comparability of our segment sales, operating profit and operating margin may be impacted favorably or unfavorably by changes in profit booking rates on our contracts. Increases in the profit booking rates, typically referred to as favorable profit booking rate adjustments, usually relate to revisions in the estimated total costs to fulfill the performance obligations that reflect improved conditions on a particular contract. Conversely, conditions on a particular contract may deteriorate resulting in an increase in the estimated total costs to fulfill the performance obligations and a reduction in the profit booking rate and are typically referred to as unfavorable profit booking rate adjustments. **Increases or decreases in profit booking rates are recognized in the period they are determined and reflect the inception-to-date effect of such changes.**

120.    The 2024 10-K also made the below representations, in relevant part, with respect

to the Company's evaluation of its disclosure controls and procedures:

**ITEM 9A. Controls and Procedures**
**Evaluation of Disclosure Controls and Procedures**
We performed an evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2024. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were effective as of December 31, 2024.
Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system is designed to provide reasonable assurance to our management and Board of Directors regarding the reliability of financial reporting and the preparation of consolidated financial statements for external purposes.

Our management conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2024. This assessment was based on the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013 framework). Based on this assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2024.

Our independent registered public accounting firm has issued a report on the effectiveness of our internal control over financial reporting, which is below.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rules 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended December 31, 2024 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis in original).

121.    The 2024 10-K also ostensibly attempted to warn the investing public of risks that

"*could*" or "*may*" harm Lockheed, including that "profitability and cash flow *may* vary based on

the mix of our contracts and programs, our performance, and our ability to control costs.

Specifically, the 2024 10-K stated, in relevant part:

Our profitability and cash flow may vary based on the mix of our contracts and programs, our performance, and our ability to control costs. Our profitability and cash flow may vary materially depending on the types of government contracts

undertaken, the nature of products produced or services performed under those contracts, the costs incurred in performing the work, the achievement of other performance objectives and the stage of performance at which the right to receive fees is determined, particularly under award and incentive-fee contracts. Failure to perform to customer expectations and contract requirements may result in reduced fees or losses and may adversely affect our financial performance.

Contract types primarily include fixed-price and cost-reimbursable contracts. Cost-reimbursable contracts provide for the payment of allowable costs incurred during performance of the contract plus a fee up to a ceiling based on the amount that has been funded. Cost, schedule or technical performance issues with respect to cost-reimbursable contracts could result in reduced fees, lower profit rates, or program cancellation. Fixed-price contracts are predominantly either firm fixed-price (FFP) contracts or fixed-price incentive (FPI) contracts. Under FFP contracts, we receive a fixed price irrespective of the actual costs we incur and therefore we carry the burden of any cost overruns. Under FPI contracts the U.S. Government is responsible for our costs up to a negotiated ceiling price and we generally share, based on a negotiated sharing formula, savings from cost underruns and expenses, up to the negotiated ceiling price, from cost overruns. We bear the risk for all cost overruns that exceed the negotiated ceiling price. Due to the fixed-price nature of the contracts, if our actual costs exceed our estimates, our margins and profits are reduced and we could incur a reach-forward loss. A reach-forward loss is when estimates of total costs to be incurred on a contract exceed total estimates of the transaction price. When this occurs, a provision for the entire loss is determined at the contract level and is recorded in the period in which the loss is evident.

### *March 27, 2025 Proxy Statement*

122.   On March 27, 2025, the Company filed the 2025 Proxy Statement. Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages solicited the 2025 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

123.   The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) elect, *inter alia*, Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages to the Board; (2) approve, on an advisory basis, the compensation of certain named executive officers; and (3) ratify the appointment of Ernst & Young LLP ("EY") as the Company's independent auditor for 2025.

124.    Regarding the Board's oversight functions, the 2025 Proxy Statement stated the following, in relevant part:

**The Board applies a sophisticated risk oversight model**

The Board and its committees undertake an integrated approach to overseeing the Company's business through a risk- and opportunity-focused lens that balances near- and long-term priorities. Core Board responsibilities include assessing corporate risk tolerance and monitoring management's processes for identifying and mitigating risks to ensure the Company's risk exposure is consistent with its strategic objectives. All of our directors have risk management expertise. The Board relies on a sophisticated risk management model and takes a particular interest in our business strategy, cybersecurity, artificial intelligence (AI), political and public policy advocacy, human rights, our people strategy and sustainability, each of which is described more fully below.

**Board of Directors**

While the Board is ultimately responsible for risk oversight, the committees possess primary responsibility for certain risk management areas, as shown below. The full Board retains primary oversight over areas such as capital structure/allocation, cybersecurity, AI, executive succession planning and strategy that are not primarily overseen by a committee. The Board receives regular reports from committees and management covering risks.

**Audit Committee**

Oversight of financial, legal and compliance risks; the enterprise risk management process, including risk identification, assessment and management; and pension liability risks

**Management Development and Compensation Committee**

Oversight of incentive compensation risks

**Classified Business and Security Committee**

Oversight of classified programs and security of personnel, facilities and data-related risks, including classified cybersecurity

**Nominating and Corporate Governance Committee**

Oversight of risks related to corporate governance, ethical conduct, sustainability, climate and environmental stewardship, corporate culture, health and safety programs, community outreach, product safety and political spending

125.    Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5)  as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

126.    The 2025 Proxy Statement was also materially false and/or misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2025 Proxy Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

127.    As a result of Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages causing the 2025 Proxy Statement to be false and misleading. Company shareholders vote to, *inter alia*: (1) reelect Defendants Taiclet, Falk, Yarrington Dunford, Donovan, Burritt, Hollub, and Reed-Klages to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) approve, on an advisory basis, the compensation of certain named executives; and (3) ratify the appoint of EY as the Company's independent auditor for 2024.

***April 22, 2025 Press Release***

128.    On April 22, 2025, Lockheed issued a press release reporting its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release boasted about the Company's financial results, including its alleged net sales and earnings, as follows, in relevant part:

- Sales increased 4% to $18.0 billion
- Net earnings of $1.7 billion, or $7.28 per share
- Cash from operations of $1.4 billion and free cash flow of $955 million
- Returned $1.5 billion of cash to shareholders through dividends and share repurchases
- Reaffirms 2025 financial outlook

**BETHESDA, Md.**, April 22, 2025 – Lockheed Martin Corporation [NYSE: LMT] today reported first quarter 2025 sales of $18.0 billion, compared to $17.2 billion in the first quarter of 2024. Net earnings in the first quarter of 2025 were $1.7 billion, or $7.28 per share, compared to $1.5 billion, or $6.39 per share, in the first quarter of 2024. Cash from operations was $1.4 billion in the first quarter of 2025, compared to $1.6 billion in the first quarter of 2024. Free cash flow was $955 million in the first quarter of 2025, compared to $1.3 billion in the first quarter of 2024.

"The momentum we created last year continued into the first quarter of 2025, with sales growing 4% year-over-year and free cash flow generation of $955 million. We continued investing in the business with over $850 million of research and development and capital expenditures in the quarter, and returned $1.5 billion to shareholders through dividends and share repurchases," said Lockheed Martin Chairman, President and CEO Jim Taiclet. "These solid first quarter results reinforce confidence in our ability to achieve the full year 2025 financial guidance we laid out in January, demonstrating the resilience and adaptability of Lockheed Martin's franchises amidst a highly dynamic geopolitical and technical environment."

\* \* \*

Aeronautics' sales during the quarter ended March 30, 2025 increased $212 million, or 3%, compared to the same period in 2024. This increase was primarily driven by a $215 million increase in sales from the F-35 program, resulting from higher volume on production contracts.

Aeronautics' operating profit during the quarter ended March 30, 2025 increased $41 million, or 6%, compared to the same period in 2024. This increase was attributable to two main factors: a $20 million increase in profit booking rate adjustments and a $20 million increase from higher volume, as described above. The increase in profit booking rate adjustments was primarily due to an $80 million

adjustment resulting from favorable performance at completion on a classified program, partially offset by lower profit rate adjustments on C-130 programs.

***April 22, 2025 Form 10-Q***

129.    On April 22, 2025, the Company also filed on Form 10-Q with the SEC its financial results for the first quarter of 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q attached SOX certifications signed by Defendants Taiclet and Scott attesting to the accuracy of the Q1 2025 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

130.    In addition to containing the same risk identification and monitoring language as the Q3 2024 10-Q, *supra* ¶ 112, the Q1 2025 10-Q stated, in relevant part:

| | Quarters Ended | |
|---|---|---|
| | March 30, 2025 | March 31, 2024 |
| **Sales** | | |
| Aeronautics | $ 7,057 | $ 6,845 |
| Missiles and Fire Control | 3,373 | 2,993 |
| Rotary and Mission Systems | 4,328 | 4,088 |
| Space | 3,205 | 3,269 |
| Total sales | $17,963 | $17,195 |
| **Operating profit** | | |
| Aeronautics | $ 720 | $ 679 |
| Missiles and Fire Control | 465 | 311 |
| Rotary and Mission Systems | 521 | 430 |
| Space | 379 | 325 |
| Total business segment operating profit | 2,085 | 1,745 |
| Unallocated items | | |
| FAS/CAS pension operating adjustment | 379 | 406 |
| Intangible asset amortization expense | (64) | (61) |
| Other, net | (28) | (61) |
| Total unallocated items | 287 | 284 |
| Total consolidated operating profit | $ 2,372 | $ 2,029 |

\* \* \*

Our contracts generally allow for the recovery of costs in the pricing of our products and services. Most of our contracts are bid and negotiated with our customers under circumstances in which we are required to disclose our estimated total costs to provide the product or service. This approach for negotiating contracts with our U.S. Government customers generally allows for recovery of our actual costs plus a reasonable profit margin. We also may enter into long-term supply contracts for certain materials or components to coincide with the production schedule of certain products and to ensure their availability at known unit prices. We have a number of programs that are designated as classified by the U.S. Government, and that cannot be specifically described. The operating results of these classified programs are included in our consolidated and business segment results and are subject to the same oversight and internal controls as our other programs.

\* \* \*

Many of our contracts span several years and include highly complex technical requirements. At the outset of a contract accounted for under the percentage-of-completion cost-to-cost method, we identify and monitor risks to the achievement of the technical, schedule and cost aspects of the contract and assess the effects of those risks on our estimates of sales and total costs to complete the contract, as well as our ability to earn variable consideration. The estimates consider the technical requirements (e.g., a newly developed product versus a mature product), the schedule and associated tasks (e.g., the number and type of milestone events) and costs (e.g., material, labor, subcontractor, overhead and the estimated costs to fulfill our industrial cooperation agreements, sometimes referred to as offset or localization agreements, required under certain contracts with international customers). The initial profit booking rate of each contract considers risks surrounding the ability to achieve the technical requirements, schedule and costs in the initial estimated total costs to complete the contract and variable considerations. Profit booking rates may increase during the performance of the contract if we successfully retire risks related to the technical, schedule and cost aspects of the contract, which decreases the estimated total costs to complete the contract or may increase the variable consideration we expect to receive on the contract. Conversely, our profit booking rates may decrease if the estimated total costs to complete the contract increase or our estimates of variable consideration we expect to receive decrease. The profit booking rate may also be adjusted if the total estimated value of the contract changes or there is a contract modification. All of the estimates are subject to change during the performance of the contract and may affect the profit booking rate. For further discussion on fixed-price contracts, see "Note 10 - Other" included in our Notes to Consolidated Financial Statements.

* * *

**ITEM 4. Controls and Procedures**

We performed an evaluation of the effectiveness of our disclosure controls and procedures as of March 30, 2025. The evaluation was performed with the participation of senior management of each business segment and key corporate functions, under the supervision of the Chief Executive Officer (CEO) and Chief Financial Officer (CFO). Based on this evaluation, the CEO and CFO concluded that our disclosure controls and procedures were operating and effective as of March 30, 2025.

There were no changes in our internal control over financial reporting during the quarter ended March 30, 2025 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

131.    The statements discussed in ¶¶ 118-121, 128-130 were materially false and/or misleading when made because they failed to disclose adverse material facts about the Company,

including, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

132. The truth fully emerged on July 22, 2025, when, prior to the market opening, Lockheed issued a press release in which it reported its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press release announced that the Company was recording an ***additional \$1.6 billion*** in pre-tax losses in connection with its classified programs. \$950 million of these losses were in connection with its Aeronautics Classified program, which the Company stated resulted from "design, integration, and test challenges, as well as other performance issues," in addition to "significant changes to its testing approach."

133. The Q2 2025 Press Release also revealed that Lockheed was recording \$570 million in losses in connection with its Canadian Maritime Helicopter Program. Lockheed attributed these losses to its provision of "additional mission capabilities, enhanced logistical support, fleet life extension, and revised expectations regarding flight hours."

134. The Q2 2025 Press Release *also* disclosed that the Company was taking a \$95 million charge related to its Turkish Utility Helicopter Program. Lockheed explained this very vaguely, attributing the loss to the "current status of the program." Finally, the Q2 2025 Press

Release stated that Lockheed was in "ongoing discussion" with its customers regarding a possible "restructure" of certain of its contractual terms and conditions.

135.    Consequently, the Q2 2025 Press Release announced drastically lower net earnings than previous quarters: net earnings stood at only $342 million, or $1.46 per share. Specifically, Q2 2025 Press Release stated, in relevant part:

**Lockheed Martin Reports Second Quarter 2025 Financial Results**

- Sales of $18.2 billion
- Recorded pre-tax losses on programs of $1.6 billion and other charges of $169 million, which impacted earnings per share by $5.83
- Net earnings of $342 million, or $1.46 per share, including impacts of program losses and other charges
- Cash from operations of $201 million and free cash flow of $(150) million
- Returned $1.3 billion of cash to shareholders through dividends and share repurchases
- Reaffirming 2025 guidance for sales and free cash flow

**BETHESDA, Md.**, July 22, 2025 – Lockheed Martin Corporation [NYSE: LMT] today reported second quarter 2025 sales of $18.2 billion, compared to $18.1 billion in the second quarter of 2024. Net earnings in the second quarter of 2025 were $342 million, or $1.46 per share, including $1.6 billion of program losses and $169 million of other charges. This compares to $1.6 billion, or $6.85 per share, in the second quarter of 2024. Cash from operations was $201 million in the second quarter of 2025, compared to $1.9 billion in the second quarter of 2024. Free cash flow was $(150) million in the second quarter of 2025, compared to $1.5 billion in the second quarter of 2024.

"Over the course of the past few months, Lockheed Martin systems and platforms once again proved highly effective in combat operations and in deterring further aggression. Our F-35s, F-22s, PAC-3, THAAD, Aegis and many others, crewed by the soldiers, aircrews, sailors, marines and guardians of the U.S. and its Allies, and supported by our own dedicated teammates, performed extremely well in the most crucial and challenging situations," said Lockheed Martin Chairman, President and CEO Jim Taiclet. "Based in part on this record of performance as well as the promise of several advanced technologies in development, our U.S. and allied customers are asking us to elevate and accelerate many key programs. For example, several allied nations have recently announced additional F-35 purchases, the U.S. Army has awarded more than $1 billion in missile-related contracts so far, and the U.S. Space Force is ordering additional GPS IIIF satellites. At the same time, our ongoing program review process identified new developments that caused us to reevaluate the financial position on a set of major legacy programs. As a result, we

are taking a number of charges this quarter to address these newly identified risks. We remain committed to delivering these critical capabilities that our customers are counting on and are fully focused on the growth inflection we expect as the result of heightened interest and demand for Lockheed Martin's products and technologies.

"Overall, the company's foundation remains solid and resilient. In the second quarter, sales of $18 billion grew sequentially, as we continued to drive supply chain improvements and ramp capacity on needed deterrent capabilities. In addition, we invested $800 million in infrastructure and innovation for growth and returned $1.3 billion to shareholders through dividends and share repurchases. We are maintaining full year 2025 guidance for sales, cash from operations, capital expense, free cash flow, and share repurchases. The program charges taken in the quarter – which resulted from our ongoing rigorous monitoring and review processes – are a necessary step as we continue to take action to improve program execution. We're investing in emerging technologies, and as a proven mission integrator, we remain well positioned to support critical programs like the Golden Dome for America. Our relentless focus on operational performance combined with our disciplined capital allocation strategy will enable us to deliver value to our shareholders, while providing the advanced solutions that America and its allies need to maintain peace through strength for decades to come."

**Program Losses and Other Charges**

During the second quarter, the Company took important steps to address challenges on a classified program at its Aeronautics business segment and certain international helicopter programs at its Sikorsky business unit.. [sic] The Company also recognized other charges related to asset impairments and a tax matter as described below.

**Aeronautics Classified Program** – Aeronautics has experienced design, integration, and test challenges, as well as other performance issues on this program. These trends continued into 2025 and had a greater impact on schedule and costs than previously estimated. As a result, Aeronautics performed comprehensive review of its program execution and management processes to achieve the technical requirements of the program, which was completed in the second quarter. Based on this review and ongoing discussions with the customer and suppliers, Aeronautics made significant changes to its processes and testing approach, resulting in significant updates to the program's schedule and cost estimates. As a result, during the second quarter of 2025 the Company recognized additional pretax reach-forward losses of $950 million on the program.

**Canadian Maritime Helicopter Program (CMHP)** – The Company is in ongoing discussions with the customer regarding a potential restructure to certain contractual terms and conditions and to expand the scope of work that would b beneficial to both parties. Communications with the customer during the second quarter of 2025 led to subsequent decisions made by the Company to focus on

providing additional mission capabilities, enhanced logistical support, fleet life extension, and revised expectations regarding flight hours. As a result of revised cost and sales estimates for the program during the second quarter of 2025, the Company recognized additional pretax losses of $570 million on this program in RMS' financial results.

**Türkish Utility Helicopter Program (TUHP)** – The Company has been discussing a potential mutually agreeable framework to restructure the program, including changing the scope of work. In light of the status of the continuing discussions with the customer and the current status of the program, RMS revised its cost and sales estimates for this program. As a result, during the second quarter of 2025, the Company recognized additional pretax reach-forward losses of $95 million on this program in RMS' financial results.

Other Charges – During the second quarter of 2025, the company recognized a charge of $66 million primarily for the write-off of fixed assets resulting from the U.S. Air Force's Next Generation Air Dominance (NGAD) down-select decision. The company also recognized a charge of $103 million related to uncertain tax positions as part of its income tax expense, resulting from the Internal Revenue Service's proposed adjustments to its tax accounting method change for certain manufacturing contracts.

The table below provides supplemental information regarding the impacts of the program losses and other charges described above.

| (in millions, except per share data) | Quarter Ended June 29, 2025 |
|---|---:|
| Aeronautics classified program loss | $ (950) |
| CMHP program loss | (570) |
| TUHP program loss | (95) |
| **Business segment operating profit** | **(1,615)** |
| Fixed asset write-off | (66) |
| Unallocated other[1] | 81 |
| **Consolidated operating profit** | **(1,600)** |
| Income tax benefit[2] | 233 |
| **Net earnings** | **$ (1,367)** |
| Weighted average shares outstanding | 234.3 |
| **Diluted earnings per share** | **$ (5.83)** |

Reflects the state income tax impact associated with the program losses based on a blended state tax rate of 5%.

Reflects the federal income tax impact associated with the program losses and fixed asset write-off net of the associated state income tax impacts based on a federal tax rate of 21%, partially offset by the charge of $103 million associated with the uncertain tax position.

**Summary Financial Results**

The following table presents the company's summary financial results:

| (in millions, except per share data) | Quarters Ended | | Six Months Ended | |
|---|---|---|---|---|
| | June 29, 2025 | June 30, 2024 | June 29, 2025 | June 30, 2024 |
| Sales | $ 18,155 | $ 18,122 | $ 36,118 | $ 35,317 |
| | | | | |
| Business segment operating profit[1,2] | $ 571 | $ 2,042 | $ 2,656 | $ 3,787 |
| Unallocated items | | | | |
| FAS/CAS pension operating adjustment | 379 | 406 | 758 | 812 |
| Impairment and other charges[3] | (66) | (87) | (66) | (87) |
| Intangible asset amortization expense | (63) | (61) | (127) | (122) |
| Other, net | (73) | (152) | (101) | (213) |
| Total unallocated items | 177 | 106 | 464 | 390 |
| Consolidated operating profit | $ 748 | $ 2,148 | $ 3,120 | $ 4,177 |
| | | | | |
| Net earnings[4] | $ 342 | $ 1,641 | $ 2,054 | $ 3,186 |
| | | | | |
| Diluted earnings per share | $ 1.46 | $ 6.85 | $ 8.75 | $ 13.24 |
| | | | | |
| Cash from operations | $ 201 | $ 1,876 | $ 1,610 | $ 3,511 |
| Capital expenditures | (351) | (370) | (805) | (748) |
| Free cash flow[1] | $ (150) | $ 1,506 | $ 805 | $ 2,763 |

136.    On this news, the price per share of the Company's common stock fell $49.79, from a closing price on July 21, 2025 of $460.53 to close at $410.74 on July 22, 2025, a single-day decrease of 10.8%.

## REPURCHASES DURING THE RELEVANT PERIOD

137.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $5.2 billion to repurchase approximately

10.8 million shares of its own common stock at artificially inflated prices between February 2024 and June 2025.

138.    According to the Q1 2024 10-Q, between January 29, 2024 and February 25, 2024, the Company purchased 1,183,474 shares of its common stock for approximately $504,50,470, at an average price of $426.33 per share.

139.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $18,450,360 for repurchases of its stock between January 29, 2025 and February 25, 2025.

140.    According to the Q1 2024 10-Q, between February 26, 2024 and March 31, 2024, the Company purchased 1,404,974 shares of its common stock for approximately $610,236,407, at an average price of $434.34 per share.

141.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $33,157,386 for repurchases of its stock between February 26, 2025 and March 31, 2025.

142.    According to the Q2 2024 10-Q, between April 1, 2024 and April 28, 2024, the Company purchased 58,858 shares of its common stock for approximately $27,183,567, at an average price of $461.85 per share.

143.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $3,008,232 for repurchases of its stock between April 1, 2024 and April 28, 2024.

144.    According to the Q2 2024 10-Q, between April 29, 2024 and May 26, 2024, the Company purchased 970,272 shares of its common stock for approximately $451,865,373, at an average price of $465.71 per share.

145.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $53,335,852 for repurchases of its stock between April 29, 2024 and May 26, 2024.

146.    According to the Q2 2024 10-Q, between May 27, 2024 and June 30, 2024, the Company purchased 807,210 shares of its common stock for approximately $371,405,393, at an average price of $460.11 per share.

147.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $39,851,958 for repurchases of its stock between May 27, 2024 and June 30, 2024.

148.    According to the Q3 2024 10-Q, between July 1, 2024 and July 28, 2024, the Company purchased 388 shares of its common stock for approximately $200,875, at an average price of $517.72 per share.

149.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $41,508 for repurchases of its stock between July 1, 2024 and July 28, 2024.

150.    According to the Q3 2024 10-Q, between July 29, 2024 and August 25, 2024, the Company purchased 675,569 shares of its common stock for approximately $373,339,696, at an average price of $552.63 per share.

151.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $95,856,485 for repurchases of its stock between July 29, 2024 and August 25, 2024.

152.    According to the Q3 2024 10-Q, between August 26, 2024 and September 29, 2024, the Company purchased 837,865 shares of its common stock for approximately $477,080,331, at an average price of $569.40 per share.

153.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $132,935,661 for repurchases of its stock between August 26, 2024 and September 29, 2024.

154.    According to the 2024 10-K, between September 30, 2024 and October 27, 2024, the Company purchased 93,965 shares of its common stock for approximately $53,256,543, at an average price of $566.77 per share.

155.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $14,661,359 for repurchases of its stock between September 30, 2024 and October 27, 2024.

156.    According to the 2024 10-K, between October 28, 2024 and November 24, 2024, the Company purchased 990,487 shares of its common stock for approximately $541,647,816 at an average price of $546.85 per share.

157.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $134,815,186 for repurchases of its stock between October 28, 2024 and November 24, 2024.

158.    According to the 2024 10-K, between November 25, 2024 and December 31, 2024, the Company purchased 795,125 shares of its common stock for approximately $410,053,914, at an average price of $515.71 per share.

159.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $83,464,271 for repurchases of its stock between November 25, 2024 and December 31, 2024.

160.    According to the Q1 2025 10-Q, between January 1, 2025 and January 26, 2025, the Company purchased 38 shares of its common stock for approximately $20,179, at an average price of $513.03 per share.

161.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $4,571 for repurchases of its stock between January 1, 2025 and January 26, 2025.

162.    According to the Q1 2025 10-Q, between January 27, 2025 and February 23, 2025, the Company purchased 1,120,680 shares of its common stock for approximately $504,776,686, at an average price of $450.42 per share.

163.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $44,468,582 for repurchases of its stock between January 27, 2025 and February 23, 2025.

164.    According to the Q1 2025 10-Q, between February 24, 2025 and March 30, 2025, the Company purchased 794,528 shares of its common stock for approximately $357,037,047, at an average price of $449.37 per share.

165.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $30,692,617 for repurchases of its stock between February 24, 2025 and March 30, 2025.

166.    According to the Q2 2025 10-Q, between March 31, 2025 and April 27, 2025, the Company purchased 51,130 shares of its common stock for approximately $23,999,399, at an average price of $469.38 per share.

167.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $2,998,263 for repurchases of its stock between March 31, 2025 and April 27, 2025.

168.    According to the Q2 2025 10-Q, between April 28, 2025 and May 25, 2025, the Company purchased 558,151 shares of its common stock for approximately $262,135,617, at an average price of $469.38 per share.

169.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $32,880,675 for repurchases of its stock between April 28, 2025 and May 25, 2025.

170.    According to the Q2 2025 10-Q, between May 26, 2026 and June 29, 2025, the Company purchased 457,838 shares of its common stock for approximately $213,892,757, at an average price of $469.38 per share.

171.    As the Company's stock was actually worth only $410.74 per share, the price at closing on July 22, 2025, the Company overpaid by approximately $25,840,377 for repurchases of its stock

172.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately ***$746.5 million***.

## DAMAGES TO LOCKHEED

173.    As a direct and proximate result of the Individual Defendants' conduct, Lockheed has lost and will continue to lose and expend many millions of dollars.

174.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

176.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

177.    Such losses include the over $746.5 million that the Company overpaid when it repurchased its own common stock at artificially inflated priced during the Relevant Period before the truth emerged.

178.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

179.    As a direct and proximate result of the Individual Defendants' conduct, Lockheed has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

180.    Plaintiff brings this action derivatively and for the benefit of Lockheed to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Lockheed, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

181.    Lockheed is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.    Plaintiff is, and has been at all relevant times, a shareholder of Lockheed. Plaintiff will adequately and fairly represent the interests of Lockheed in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Lockheed's Board consisted of the following ten individuals: Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages (collectively, the "Director-Defendants"), and non-parties John C. Aquilino and Heather Wilson (together, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

185.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to

repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

186.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Lockheed to issue materially false and misleading statements while simultaneously causing the Company to overpay by approximately $746.5 million for repurchases of its own common stock during the Relevant Period while the Company's common stock price was artificially inflated due to the false and misleading statements alleged herein. Specifically, the Director-Defendants caused Lockheed to issue false and misleading statements which were intended to make Lockheed's business appear more profitable and stable to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

187.    Additional reasons that demand on Defendant Taiclet is futile follow. Defendant Taiclet has served as a director of the Company since 2018, as CEO and President of the Company since 2020, and as Chairman of the Board since March 2021. As such, the Company provides Defendant Taiclet with his principal occupation, for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As CEO, President, and Chairman of the Board throughout the Relevant Period, Defendant Taiclet was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Taiclet also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Taiclet also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Taiclet signed the false and misleading 2023 and 2024 10-Ks, as well as the SOX certifications of all quarterly reports cited herein. Moreover, Defendant Taiclet is a defendant in the Securities Class Action. For these reasons, Defendant Taiclet breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.    Additional reasons that demand on Defendant Falk is futile follow. Defendant Falk has served as a Company director since 2010. He also currently serves as the Company's Lead Independent Director and additionally as the Chair of the Nominating and Corporate Governance Committee. Defendant Falk has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Falk also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Yarrington, Dunford, Donovan, Burritt, Hollub,

Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Falk also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Yarrington, Dunford, Donovan, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Falk signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Falk breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

189.    Additional reasons that demand on Defendant Yarrington is futile follow. Defendant Yarrington has served as a Company director since June 2021. She also serves as the Chair of the Audit Committee and as a member of the Classified Business & Security Committee. Defendant Yarrington has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Yarrington also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Dunford, Donovan, Burritt, Hollub, Reed-Klages, and herself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Yarrington also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Dunford, Donovan, Burritt, Hollub, Reed-Klages, and herself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Yarrington signed the false and misleading 2023 and 2024 10-Ks. For these

reasons, Defendant Yarrington breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

190.    Additional reasons that demand on Defendant Dunford is futile follow. Defendant Dunford has served as a Company director since 2020. He also serves as the Chair of the Classified Business and Security Committee, and also a member of the Nominating and Corporate Governance Committee. Defendant Dunford has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Dunford also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Donovan, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Dunford also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Donovan, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Dunford signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Dunford breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

191.    Additional reasons that demand on Defendant Donovan is futile follow. Defendant Donovan has served as a Company director since October 2021. Defendant Donovan also serves as the Chair of the Management Development and Compensation Committee, and as a member of

the Classified Business and Security Committee. Defendant Donovan has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Donovan also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Donovan also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Burritt, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Donovan signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Donovan breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

192.    Additional reasons that demand on Defendant Burritt is futile follow. Defendant Burritt has served as a Company director since April 2008. He also serves as a member of the Audit Committee and as a member of the Management Development and Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Burritt also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the

shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Burritt also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Hollub, Reed-Klages, and himself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Burritt signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Burritt breached his fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon him is futile and, therefore, excused.

193.    Additional reasons that demand on Defendant Hollub is futile follow. Defendant Hollub has served as a Company director since July 2018. She also serves as a member of the Audit Committee and as a member of the Management Development and Compensation Committee. Defendant Hollub has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Hollub also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Reed-Klages, and herself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Hollub also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Reed-Klages, and herself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Hollub signed the false and misleading 2023 and 2024 10-Ks. For

these reasons, Defendant Hollub breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

194.    Additional reasons that demand on Defendant Reed-Klages is futile follow. Defendant Reed-Klages has served as a Company director since November 2019. She also serves as a member of the Management Development and Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Reed-Klages has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Reed-Klages also solicited the 2024 Proxy Statement, which contained false and misleading information contributing, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and herself, allowing them to continue breaching their fiduciary duties to the Company. Defendant Reed-Klages also solicited the 2025 Proxy Statement, which contributed, *inter alia*, to the shareholders voting to reelect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and herself, allowing them to continue breaching their fiduciary duties to the Company. Further, Defendant Reed-Klages signed the false and misleading 2023 and 2024 10-Ks. For these reasons, Defendant Reed-Klages breached her fiduciary duties, faces a substantial likelihood of liability, is not disinterested, and thus demand upon her is futile and, therefore, excused.

195.    Additional reasons that demand on the Board is futile follow.

196.    Defendants Yarrington, Burritt, and Hollub (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were

responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

197.    In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

198.    Lockheed has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for

Lockheed any part of the damages Lockheed suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

199.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

200.    The acts complained of herein constitute violations of fiduciary duties owed by Lockheed's officers and directors, and these acts are incapable of ratification.

201.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lockheed. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Lockheed, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

202.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Lockheed to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

203.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

204.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

206.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

207.    Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages caused the 2024 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

208.    Moreover, the 2024 Proxy Statement failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2024 Proxy Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

209.    Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and/or misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of directors.

210.    As a result of Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage causing the 2024 Proxy Statement to be false and/or misleading, the shareholders voted to, *inter alia*, re-elect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage to the Board, thereby enabling them to continue to breach their fiduciary duties to the Company.

211.    The Company was damaged as a result of Defendants Taiclet, Flak, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage making material misrepresentations and omissions in the 2024 Proxy Statement.

212.    Additionally, Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages caused the 2025 Proxy Statement to be false and/or misleading by failing to disclose, *inter alia*, that: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5)  as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

213.    Moreover, the 2025 Proxy Statement failed to disclose that the Company's Code of Ethics was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and/or misleading statements and/or omissions alleged herein; and (2) failing to report violations of the Code of Ethics. Furthermore, the 2025 Proxy Statement was materially false and/or misleading because, despite assertions to the contrary, the board was not adequately performing its risk oversight functions.

214.    Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klages knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and/or misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors.

215.    As a result of Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage causing the 2025 Proxy Statement to be false and/or misleading, the shareholders voted to, *inter alia*, re-elect Defendants Taiclet, Falk, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage to the Board, thereby enabling them to continue to breach their fiduciary duties to the Company.

216.    The Company was damaged as a result of Defendants Taiclet, Flak, Yarrington, Dunford, Donovan, Burritt, Hollub, and Reed-Klage making material misrepresentations and omissions in the 2025 Proxy Statement.

217.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Lockheed. Not only is Lockheed now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Lockheed by the Individual Defendants. With the price of its common stock trading at artificially inflated prices

due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase approximately 10.8 million of its own shares at artificially inflated prices, damaging Lockheed.

183.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

184.     The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Lockheed not misleading.

185.     The Individual Defendants, as top executives, acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

186.     By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

187.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188.    The Individual Defendants, by virtue of their positions with Lockheed and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Lockheed and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Lockheed to engage in the illegal conduct and practices complained of herein.

189.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lockheed's business and affairs.

192.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

193.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lockheed.

194.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false

and misleading statements about Lockheed's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, inter alia: (1) Lockheed lacked internal controls for its allegedly risk-adjusted contracts, including the reporting of its risk-adjusted profit booking rate; (2) the Company lacked effective procedures to review program requirements and scheduling, technical complexities, and risk; (3) the Company overstated its ability to deliver on contract commitments with respect to both schedule and cost; (4) consequently, the Company faced substantial risk of reporting significant losses; and (5) as a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

195.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

196.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

197.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the company to repurchase more than 10.8 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while simultaneously Defendants Taiclet and Malave engaged in lucrative insider sales of Company common stock, netting combined proceeds of approximately $16.7 million.

198.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

199.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

200.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

201.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lockheed has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lockheed.

205.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Lockheed that was tied to the performance or artificially inflated valuation of Lockheed or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

206.    Plaintiff, as a shareholder and representative of Lockheed, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

207.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lockheed, for which they are legally responsible.

210.    As a direct and proximate result of the Individual Defendants' abuse of control, Lockheed has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lockheed in a manner consistent with the operations of a publicly held corporation.

214.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lockheed has sustained and will continue to sustain significant damages.

215.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

216.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.    In addition, the Individual Defendants caused the Company to repurchase 10.8 million shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

220.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

221.    Plaintiff, on behalf of Lockheed, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Taiclet, Scott, and Malave for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

222.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223.    Lockheed, Defendant Taiclet, Defendant Scott, and Defendant Malave are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the willful and/or reckless violations of their obligations as officers and/or directors of Lockheed by Defendants Taiclet, Scott, and Malave.

224.    Defendants Taiclet, Scott, and Malave, because of their positions of control and authority as officers and/or directors of Lockheed, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Lockheed, including the wrongful acts complained of herein and in the Securities Class Action.

225.    Accordingly, Defendants Taiclet, Scott, and Malave are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

226.    As such, Lockheed is entitled to receive all appropriate contribution or indemnification from Defendants Taiclet, Scott, and Malave.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Lockheed, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lockheed;

(c)    Determining and awarding to Lockheed the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Lockheed and the Individual Defendants to take all necessary actions to reform and improve Lockheed's corporate governance and internal procedures to comply with applicable laws and to protect Lockheed and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Lockheed to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Lockheed restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

97

## **VERIFICATION**

I, Jereth Camacho, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10  day of September, 2025.

DocuSigned by:

BDABD82DD7574A3

Jereth Camacho